IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:19-CR-9-FL-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| MAURICE MONTRELL GREENE. | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on defendant's motion to suppress certain evidence allegedly obtained in violation of the Fourth Amendment to the United States Constitution. (DE 173). Pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Criminal Procedure 59(b), United States Magistrate Judge Robert T. Numbers, II, entered memorandum and recommendation ("M&R"), wherein it is recommended that defendant's motion be denied. (DE 254). Defendant timely objected to the M&R, and the government responded. In this posture, the issues raised are ripe for ruling. For the following reasons, defendant's motion is denied.

## STATEMENT OF THE CASE

Indictment filed February 6, 2019, charges defendant with conspiracy to distribute and possess with the intent to distribute 500 grams or more of cocaine, in violation of 21 US.C. § 841(a)(1). Defendant filed the instant motion on October 11, 2019, seeking suppression and exclusion of all evidence obtained February 23, 2018, pursuant to a warrant authorizing search of a residence at 287 Northwest Acres Drive, Greenville, North Carolina ("the residence"), allegedly in violation of the Fourth Amendment to the United States Constitution. In support of the motion,

defendant relies upon search warrant issued by Pitt County Superior Court on February 23, 2018. The government responded in opposition on October 29, 2019. After briefing completed, the United States Magistrate Judge James E. Gates held hearing on motion to suppress on May 11, 2020, at which the court heard testimony of Amber Taylor ("deputy Taylor"), a patrol deputy with the Pitt County Sheriff's Office.

The court also admitted the following exhibits offered by defendant: 1) photograph of the residence, 2) close up photograph of the residence, 3) photograph of the house number of the residence, 4) photograph of parking lot near the residence, 5) photograph of parking lot across from New York Grocery and Northwest Acres Road, 6) photograph of New York Grocery, 7) photograph of Northwest Acres Road, and 8) a supplemental photograph of Northwest Acres Road. In addition, the court admitted the following exhibits offered by the government: 1) a document indicating defendant's location while on electronic monitoring from June 17, 2017, until July 18, 2017, through GPS points; 2) a map overview of the area surrounding the residence; 3) a zoomed in map of the area surrounding the residence; and 4) search warrant issued by Pitt County Superior Court on February 23, 2018, as well as an inventory of the items seized pursuant to the search warrant.

Following re-referral of the instant motion to United States Magistrate Judge Robert T. Numbers, II, on April 15, 2020, M&R entered on June 9, 2020, wherein it is recommended that the instant motion be denied. Defendant filed objections on June 23, 2020, and the government responded on July 1, 2020.

## STATEMENT OF FACTS

The court incorporates herein for ease of reference the facts set forth in the M&R.

> During the afternoon of February 23, 2018, Pitt County Sheriff's Deputy Amber Taylor was patrolling the northside of Pitt County in an unmarked vehicle.

Suppression Hr'g Tr. 25:17–23, 31:24–25, D.E. 217. Taylor drove to 287 Northwest Acres Drive—Greene's residence—to conduct surveillance on Greene. *Id.* at 25:24-26:4; D.E. 174–1 at 5. Law enforcement in Pitt County knew Greene was a leader of the Crips and was involved in drug trafficking. Tr. 8:12–17, 9:3–12. They considered Greene to be one of their five highest targets because of his status as a gang leader in Ayden, North Carolina. *Id.* 8:12-9:2.

Taylor had monitored Greene in person and through electronic monitoring when Greene was on state probation and living on N.C. 33 West. *Id.* at 11:8–11, 15:14–19, 15:24–16:8. She had studied Greene's movements and learned his daily habits. *Id.* 15:19–23, 18:21–23. He would travel to 287 Northwest Acres Drive in the morning, and then to addresses of possible family members and addresses known for drug trafficking. *Id.* 18:24-19:14, 20:16–22, 22:18-23:8, 23:21-24:2, 24:6–16. Greene never traveled to a legitimate employer during the workday. *Id.* at 25:6–16.

Taylor also knew that law enforcement had searched Greene's residence on N.C. 33 West and found large amounts of U.S. currency but no narcotics. *Id.* at 24:17–22. Based on her experience, Taylor believed that Greene was participating in drug trafficking and storing the currency and narcotics separately. *Id.* at 24:22–23. Taylor thought Greene was keeping narcotics at 287 Northwest Acres Drive. *Id.* at 24:23-25:5.

As Taylor drove by 287 Northwest Acres Drive—the sixth house on the left side of a dead-end street—Taylor saw Greene's white Jaguar parked in the driveway. *Id.* at 26:5–7, 27:13–16. She recognized the Jaguar because during a search of Greene's residence in 2016, officers had found $20,000 in that car. *Id.* at 12:1–11, 26:8–11. Taylor ran the Jaguar's license plate and learned it had multiple insurance and inspection violations and a pick-up plate notice, meaning the tags should be removed. *Id.* at 26:15–20; D.E. 174–1 at 5.

Once Taylor saw Greene's Jaguar, she returned to the entrance of Northwest Acres Drive. Tr. 27:22–25. She pulled her car against a fence in the parking lot of an abandoned night club on the corner to wait. *Id.* at 27:20-28:1. Taylor planned to prevent the Jaguar from leaving, but she didn't want anyone in the residence to see her. *Id.* 27:25-28:4.

After she parked, Taylor saw a blue Nissan parked at the grocery store across the street from the nightclub. *Id.* 28:17–19, 30:1–4; D.E. 174–1 at 5. A black male exited the Nissan, stopped and looked at Taylor, stood outside the Nissan, and reentered the car. Tr. 30:4–6; D.E. 174–1 at 5. He never entered the store. Tr. 30:7–8. The Nissan sat in the parking lot for about three minutes before pulling out and turning down Northwest Acres Drive. *Id.* at 30:6–9; D.E. 174–1 at 5.

Taylor felt she had startled the man and thought he might be going to Greene's house. Tr. 30:9–11, 17–20. She waited half a minute before driving onto

3

Northwest Acres Drive and confirming that the Nissan had pulled in Greene's driveway behind the Jaguar. *Id.* at 30:20–23; D.E. 174–1 at 5. She then backed her car into her original parking spot to avoid being seen by anyone leaving the residence. Tr. 32:15–18. She did not see the driver of the Nissan go inside 287 Northwest Acres Drive. *Id.* at 32:13–15.

About five minutes later, the Nissan drove back down Northwest Acres Drive and turned left onto Old River Road. *Id.* at 32:19-33:5; D.E. 174–1 at 5. Taylor pulled out and began following the Nissan. Tr. 33:6–7. After seeing the Nissan run off the road twice, Taylor conducted a traffic stop about two miles from Northwest Acres Drive. *Id.* at 33:8–22; D.E. 174–1 at 5-6. She called another deputy to respond to the scene. Tr. 36:8; D.E. 174–1 at 6.

As she approached the Nissan, Taylor recognized the driver as Kashawn Lenzy. Tr. 34:3–7; D.E. 174–1 at 6. Taylor knew him from a traffic stop in November 2017 during which he swallowed narcotics. Tr. 34:8–11; D.E. 174–1 at 6. Lenzy appeared nervous and apologized. Tr. 35:2–4; D.E. 174–1 at 6. Taylor asked where Lenzy was coming from, and Lenzy said he was coming from his cousin John's house. Tr. 35:5–8; D.E. 174–1 at 6. Lenzy could not provide his cousin's last name. Tr. 35:13–17; D.E. 174–1 at 6. Lenzy said that he had had been on Northwest Acres Drive visiting the third house on the right, which Taylor knew was not true. Tr. 35:8–12; D.E. 174–1 at 6.

Taylor asked Lenzy to step out of the Nissan. Tr. 35:21–23; D.E. 174–1 at 6. Lenzy began spitting often, which, in Taylor's experience, meant he likely swallowed something. Tr. 35:24–36:5; D.E. 174–1 at 6. Lenzy consented to a search of the Nissan and his person. D.E. 174–1 at 6. Neither Taylor nor the other deputy on scene found any narcotics. Tr. 36:6–12; D.E. 174–1 at 6.

Taylor ran Lenzy's license and learned that he was on active probation and his license was suspended. Tr. 36:13–21; D.E. 174–1 at 6. She gave Lenzy a verbal warning, told him he could not drive the Nissan away, and that someone needed to come pick him up. Tr. 36:22–37:1; D.E. 174–1 at 6. Lenzy used his cell phone to arrange a ride. Tr. 37:2–6.

Soon after, Taylor saw Greene's Jaguar driving past the traffic stop with someone in the passenger seat. *Id.* at 37:10–17; D.E. 174–1 at 6. Taylor got in her car and tried to catch up with Greene to stop the Jaguar based on the vehicle's violations. Tr. 37:18–21; D.E. 174–1 at 6. Instead, Greene made a U-turn and returned to the location of Lenzy's stop. Tr. 37:24–38:7.

While both Taylor and the second deputy had their blue lights on, neither officer pulled Greene over; he stopped on his own accord. Tr. 38:8–13. He backed into a driveway across from where the Nissan was stopped, and the other deputy pulled his vehicle over. *Id.* The passenger in Greene's car was his mother, who

4

explained that she and Greene both lived on Northwest Acres Drive and were coming from their house. *Id.* at 39:5–9, 40:19–21; D.E. 174–1 at 6.

Greene said he did not know Lenzy, but that he drove by and had come back to give him a ride. Tr. 38:15–21; D.E. 174–1 at 6. Taylor asked Lenzy if Greene was his cousin John, and Lenzy confirmed that it was. Tr. 38:24–39:1; D.E. 174–1 at 6. The deputies searched Greene's person and found a large amount of cash but did not confiscate it. Tr. 38:22–23, 50:21–51:1; D.E. 174–1 at 6. Greene also consented to a search of his Jaguar, but officers did not find any narcotics. Tr. 39:10–14, 50:17–20; D.E. 174–1 at 6.

While searching the trunk of Greene's Jaguar, Taylor heard the loud squealing of tires. Tr. 39:15–18; D.E. 174–1 at 6. Lenzy had gotten back into the Nissan and ran it off the road trying to flee. Tr. 39:18–20; 51:6–8; D.E. 174–1 at 6. When Lenzy exited the wrecked Nissan, his demeanor had changed; he was drooling, could hardly walk, and had slurred speech and small pupils. Tr. 39:21–40:5; D.E. 174–1 at 6.

Taylor believed Lenzy had ingested a large amount of drugs and that they were starting to affect him. Tr. 40:6–9, 41:1–2. He was sweating and his heart rate was high, which suggested cocaine usage. Id. at 41:6–10. She was concerned his heart may explode if he had indeed ingested cocaine, so she called EMS. Id. at 41:1–3; D.E. 174–1 at 6. Based on the timing of the vehicle stop of the Nissan, Lenzy's history of swallowing drugs, and Lenzy's change in demeanor, Taylor believed he had swallowed narcotics that he bought from Greene. Tr. 41:11–15; D.E. 174–1 at 6. Taylor thought Lenzy got the drugs from Greene because Greene was a known drug trafficker, Lenzy had just visited 287 Northwest Acres Drive, Lenzy swallowed drugs after Taylor pulled him over, and Greene showed up at the traffic stop to give Lenzy a ride. Tr. 41:21–42:3.

When EMS arrived, they determined Lenzy's heart rate was too high and transported him to the hospital. *Id.* at 42:4–9; D.E. 174–1 at 6. Greene told Lenzy he would go to the hospital and wait on him. Tr. 42:10–12.

Later that day, Taylor drafted a search warrant to search 287 Northwest Acres Drive based on her observations. *Id.* at 42:13–18; D.E. 174–1. She included no events that occurred after EMS took Lenzy to the hospital. Tr. 51:16–23. She presented the search warrant to a Superior Court judge in Pitt County who signed it. *Id.* at 42:19–25. Law enforcement then searched 287 Northwest Acres Drive and located 927 grams of cocaine in brown paper wrapping in a child's bedroom floor vent, a bag of clear powder cocaine weighing 8.3 grams, a 12-gauge shotgun, a Mossberg shotgun, five 12-gauge shotgun shells, two digital scales, and a cell phone. Id. at 43:1–11.

Taylor later submitted a search warrant for Lenzy's health records and discovered he had ingested seven grams of cocaine. *Id.* at 53:10–15.

5

In February 2019, a federal grand jury indicted Greene for conspiracy to distribute and possess with the intent to distribute 500 grams or more of cocaine. D.E. 1.

(M&R (DE 254) at 2-6).

## COURT'S DISCUSSION

A.      Standard of Review

The district court reviews de novo those portions of a magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b). The court does not perform a de novo review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R. Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

B.      Analysis

Defendant objects to the magistrate judge's finding that the search warrant for the residence was supported by probable cause, and the alternative finding that the good faith exception applies to the instant action.

    1.      Probable Cause

The Fourth Amendment to the United States Constitution secures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "This fundamental right is preserved by a requirement that

6

searches be conducted pursuant to a warrant issued by an independent judicial officer." United States v. Hodge, 354 F.3d 305, 309 (4th Cir. 2004) (quoting California v. Carney, 471 U.S. 386, 390 (1985)). Additionally, to be valid, a search warrant must "contain a particular description of the place to be searched, and the persons or things to be seized" and "be based upon probable cause, supported by Oath or affirmation." United States v. Clyburn, 24 F.3d 613, 617 (4th Cir. 1994) (citing Dalia v. United States, 441 U.S. 238, 255 (1979)).

"The probable cause standard is not defined by bright lines and rigid boundaries." United States v. Williams, 974 F.2d 480, 481 (4th Cir. 1992). Rather, "the standard allows a magistrate to review the facts and circumstances as a whole and make a commonsense determination of whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" Id. (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). Indeed, "the facts presented to the magistrate need only 'warrant a man of reasonable caution' to believe that evidence of a crime will be found." Id. (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)). This standard "does not demand showing that such a belief be correct or more likely true than false." Id.

When reviewing a magistrate's probable cause determination, "[the court's] inquiry is directed to whether the magistrate had a substantial basis for his conclusion that probable cause existed." Id. In conducting this inquiry, "[the court] must accord great deference to the magistrate's assessment of the facts presented to him." United States v. Blackwood, 913 F.2d 139, 142 (4th Cir. 1990). Additionally, "the reviewing court must consider only the information presented to the magistrate who issued the warrant." United States v. Wilhelm, 80 F.3d 116, 118 (4th Cir. 1996). Importantly, "reviewing courts must resist the temptation to 'invalidate warrants

7

by interpreting affidavits in a hypertechnical, rather than a commonsense, manner.'" Blackwood, 913 F.2d at 142 (quoting Gates, 462 U.S. at 236).

Defendant objects to the finding in the M&R that there are sufficient facts to establish a nexus between the alleged drug activity and the residence. There is, however, ample evidence in the record reasonably to draw this connection. First, deputy Taylor was familiar with defendant's gang affiliation and drug trafficking, and she conducted surveillance on him in 2017, in person and through electronic monitoring. (Transcript of Hearing ("Tr.") (DE 217) 8:3-9:12, 15:14-16:22). Through this surveillance, deputy Taylor observed defendant frequent the residence first thing in the morning, for short periods of time, on numerous occasions. (Tr. 18:18-19:6). Because of this knowledge, deputy Taylor set up surveillance of the residence on the day in question, through which she observed Kashawn Lenzy ("Lenzy") exhibit suspicious behavior, suggesting a drug transaction occurred at the residence.

Specifically, deputy Taylor witnessed Lenzy drive to the residence for a brief visit, lasting approximately five minutes, and then drive away. (Tr. 32:7-25). Deputy Taylor followed Lenzy's vehicle and saw him struggle to maintain lane control; therefore, she conducted a traffic stop on his vehicle. (Tr. 33:4-14). Upon approaching Lenzy, deputy Taylor recognized him from a November 2017 traffic stop, during which Lenzy swallowed cocaine. (Tr. 34:3-17).

Lenzy appeared nervous and told deputy Taylor that he had just left his cousin John's house, which was third house on the right on Northwest Acres Road. (Tr. 35: 2-10). Deputy Taylor became suspicious because she had observed him coming from the residence, which was on the left side, rather than the right side, of Northwest Acres Road. (Tr. 35:7-12). Her suspicion increased when he could not provide her with his alleged cousin's last name. (Tr. 35:13-17).

When defendant arrived on scene, he had a large amount of United States currency on his presence, and his mother indicated they just left the residence. (Tr. 38:22-39:21). Moreover, defendant claimed he did not know Lenzy; yet, he told officers he was there to give Lenzy a ride. (Tr. 38:14-23). Lenzy contradicted defendant's already inconsistent account by stating that defendant was his cousin John that he referenced earlier. (Tr. 38:24-39:4). Finally, Lenzy's demeanor changed rapidly during the traffic stop, as he began drooling on his left forearm, slurring his speech, struggling to walk, and his pupils became significantly smaller. (Tr. 39:21-40:18). Based on deputy Taylor's observations that day, her experience as a law enforcement officer, and her knowledge of a previous incident in which Lenzy ingested cocaine during a traffic stop, she believed that Lenzy recently purchased narcotics from defendant at the residence and ingested them during the traffic stop. (Tr. 36:1-5; Taylor Aff. (DE 174-1) at 6-7).

Notwithstanding the foregoing, defendant argues there is not a sufficient nexus between the alleged drug activity and the residence because deputy Taylor did not witness Lenzy enter or exit the residence, she did not witness a drug transaction between defendant and Lenzy, and the affidavit did not mention a history of suspicious drug activity inside the residence.[1] However, as the United States Court of Appeals for the Fourth Circuit has held, "a sufficient nexus can exist between a defendant's criminal conduct and his residence even when the affidavit supporting the warrant contains no factual assertions directly linking the items sought to the defendant's residence." United States v. Grossman, 400 F.3d 212, 217 (4th Cir. 2005) (quotations omitted). Indeed, "probable cause can be inferred from the circumstances, and a warrant is not invalid for

---

[1] Defendant also argues defendant's and Lenzy's past behavior does not support an inference that a drug transaction occurred at the residence, merely because of defendant's presence therein. However, deputy Taylor did not base her inference solely on defendant's presence at the residence. Rather, her conclusions set forth in the search warrant affidavit were based upon experience in law enforcement, her observations that day, and the contradictory accounts provided by defendant and Lenzy.

9

failure to produce direct evidence that the items to be seized will be found at a particular location." United States v. Lalor, 996 F.2d 1578, 1582 (4th Cir. 1993).

Here, considering deputy Taylor's awareness that defendant is known drug trafficker, and her prior sightings of him at the residence; Lenzy's brief visit to the residence, and his behavior suggesting he ingested narcotics shortly thereafter; defendant's possession of a large amount of United States currency, and his mother's acknowledgement that he had just left the residence, where he lives with her; and the suspicious and contradictory accounts provided by Lenzy and defendant; it reasonably could be inferred from the circumstances that contraband and narcotics would be found at the residence, and the issuing judge had a substantial basis for concluding that probable cause existed.

2. Good Faith Exception

Finally, defendant objects to the magistrate judge's alternative finding that, even if the search warrant lacked probable cause, the good faith exception applies. Under the exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." United States v. Thomas, 908 F.3d 68, 72 (4th Cir. 2018). However, the United States Supreme Court carved out an exception to that rule, known as the "good faith exception," "under which evidence obtained by an officer who acts in objectively reasonable reliance on a search warrant will not be suppressed, even if the warrant is later deemed invalid." Id. (citing United States v. Leon, 468 U.S. 897, 922 (1984). When "assessing the officer's objective good faith," reviewing courts may "look beyond the four corners of the affidavit" and consider "all the circumstances" including "uncontroverted facts known to an officer but inadvertently not presented to the magistrate." Id. at 73.

10

Case 4:19-cr-00009-FL   Document 272   Filed 07/08/20   Page 10 of 12

The Fourth Circuit has enumerated four "limited situations" in which the good faith exception will not apply:

> 1) when the affiant base[s] his application knowing or reckless falsity; 2) when the judicial officer wholly abandon[s] his role as a neutral and detached decision maker and served merely as a rubber stamp for the police; 3) when the affidavit supporting the warrant [i]s so lacking in indicia of probable cause as to render official belief in its existence and entirely unreasonable; and 4) when the warrant [i]s so facially deficient that the executing officers could not reasonably have presumed that the warrant was valid.

United States v. Wellman, 663 F.3d 224, 228-229 (4th Cir. 2011).

Here, relying on the third situation, defendant argues the good faith exception does not apply because of the "bare bones" nature of the affidavit.[2] However, far from being "bare bones", the affidavit outlines in sufficient detail deputy Taylor's extensive experience in law enforcement, her familiarity with defendant as a known gang leader and drug trafficker, and her observations suggesting that a drug transaction occurred at the residence. Moreover, the remaining "limited situations" do not apply, where there is no evidence to suggest that deputy Taylor based her affidavit on knowing or reckless falsity, that the issuing judge served as a rubber stamp for police, or that the warrant was so facially deficient that officers could not have presumed reasonably that it was valid. Accordingly, the good faith exception precludes suppression of evidence obtained during the February 23, 2018, search of the residence.

In sum, the warrant was supported by probable cause; however, even if probable cause was lacking, the good faith exception applies; thus, defendant's motion to suppress is denied

## CONCLUSION

---

[2] Defendant also argues the superior court judge merely served as a "rubber stamp" in approving the affidavit because there was no nexus between the suspected criminal activity and the residence. Where the court has already rejected this contention, it declines to address defendant's argument again.

Based on the foregoing, the court ADOPTS the recommendation of the M&R (DE 254) and DENIES defendant's motion to suppress. (DE 173).

SO ORDERED, this the 8th day of July, 2020.

_____
LOUISE W. FLANAGAN
United States District Judge